The first case on the call is 5-14-0011, and it's the Estate of Bates. Counselor, I'd like to proceed. Go ahead. Hey, please record, counsel. My name is Matthew Gates. I'm here on behalf of the Bolling, Sarah Bates. Your Honor, you're familiar with the briefs. This mainly is concerning the death of the Bolling, Bates, and the will, or the alleged will, that he had in our context. We have two points that we're raising at this point, which is blocking capacity and undue influence. Now, this was all heard on the summary judgment. Now, so this is, as everyone knows, the purpose of summary judgment is not to try issues of fact, but determine if there was a trial issue of fact. What I would submit to this body is that the trial court weighed the evidence, took our witnesses, and decided, you know what, my gut instinct is, in this case, the employees, they're going to win. And that's how he ruled. The judge, even when he was making his ruling, mentioned he had his litigator apart. He kind of comes from that kind of a thought process. And I understand that. That's fine. But that was not his role. His role was to determine, do we have an issue of fact? So let's look at testamentary facts. Are you suggesting that the trial court said something on the record, that he was weighing evidence, or anything like that, or? Judge, I'm submitting. You're just saying because of the evidence, you're saying there was a genuine issue of material fact. I'm saying both, actually. And the one, it was simply that when he was orally giving his ruling on a telephone conference, he mentioned the basis of a litigator. What I interpreted as his mindset came from that. Well, did he say anything about, I think this witness is more credible, or did he say he was making credibility determinations, or anything like that? I don't answer that. Okay. I don't answer that. But the ruling that he made, and the evidence that was presented, I can clearly present that to this body. Which is that, looking at the witnesses, and I know deference is often given in trial courts, but not here. It's phenomenal. You all can sit, that's first impression, looking at the case, and did all the reads have testamentary capacity? Did he have sufficient mind and memory? Did he know the natural object system, time and character as a property, and did this exist at all in his mind? Now, counsel has done an eloquent job of trying to narrow the time period, narrow the time period to the only thing we can show is we have to show at that very moment in time is the only thing we can look at is the day he executed the murder. The Ressler case clearly says we can look at his mind and his mental capacity for two years. There's actually been no appellate court that's stated for sure how far out you can go, but at least Ressler says you can look at two years' time. So looking at that, you have clearly enough evidence. Look first at D. McWorthy. D. McWorthy, the nephew, he says that it's a gray area, after 2000. He talks about the fact that Oliver Bates didn't pay his property taxes. Now, I understand that's in 2005, but he's looking at notices that would have been coming for the years before. Everyone knows that the IRS doesn't instantly say, you don't pay your taxes the next day we're seizing your land. He's looking at 2005, they're going to be seizing his land. Everyone agrees Oliver Bates loved his land. My goodness, would the person with capacity, normal capacity, capacity to do the will, be concerned that the IRS is seizing his land? What about his personal physician, I think it was, who said that he had some onset of problems, but it wasn't necessarily something that, an onset that existed about the time of the execution of the will? I understand, Your Honor, and that's why we also have him talk about how dementia and Alzheimer's both come on. At the period of 2004, in the doctor's notes, you for sure see, he's finally said, okay, I'm sure now. Yes, he for sure has dementia, I'm doing it. Dr. Duvall also talks about the progression of that. Again, it's not like flipping a switch, and on Monday he had dementia, and on Sunday, the day before, he did not. It's a two to three year progress, at a minimum of a range. So, if he's already saying for sure, yep, complete, he's gone, we've got dementia here at this point, then you have an onset of that earlier, and that affected him. He had higher failure than many mental health exams. Looking also back to the period of time when he actually executed the will, Dr. Duvall was treated from Lovi and B-12, and we had some discussion about it, it was really dementia he had, and he was mistreating him with Lovi and B-12, and back and forth, and whatnot. Regardless, even if it's Lovi and B-12, some of the symptomology of that is lack of memory, dementia, comprehension skills, and what Dr. Duvall also testified to was that in the months preceding it, he was taking his Lovi and B-12 shots. He wasn't taking them. Counsel tried to say, well, it's possible because he chose not to take them, and our position would be that he didn't have the capacity to know who would get them done, but the point of this is, he wasn't taking them. And he was having, so he was having the capacity of someone who should have been getting both of his Lovi and B-12 shots for those various things, and then goes and does his will. Also, Dr. Duvall states as follows, that, eh, he was getting some legal documents, but more complex ones I'm not so okay with. I wouldn't be as sure of saying that. That's a point. What could be more? In a person's life, a will is one of the most complex legal documents that most people will encounter. Maybe a mortgage, I suppose, but most people don't read the mortgage, at least not in my practice. I haven't read mortgages. But darn it, wills? That's probably one of the most complex things you can do. And so I don't think Dr. Duvall cuts as clearly as counsel would have you when you really look through his deposition and review it. You also have Christine McCoy. Christine's the niece. Someone else who, by her own admission, testified she had been more close with Rebecca growing up, not Sarah, not biased toward our client in some way. She gave great evidence of his easy confusion. Not only confusion, but easy to be influenced, doing what the person he was with wanted to do. His miscomprehension. Talks about the person, and everybody testified that earlier on he was a hoarder, kept things, wanted to keep things. But then later, he's basically giving away to her whatever she asked for. She basically stated she could have taken him down to an auto dealership and he would have bought her a car. She didn't do that, but the point is she could have. Isn't that kind of speculation, whether she could have taken him to the auto dealer and he would have bought her a car? It absolutely is, but it's based on her interactions with him and her evaluation, which a layperson can do of his mental capacity. It's just part of her opinion. It's part of her opinion, absolutely. And that's the point. It's white evidence. That's exactly what we're doing here. We're trying to decide, well, is that person's opinion of what his capacity was different than this person's? I agree. Everyone in here. I'm not doing this before a jury. Sure. But let's give him a chance. And the trial court was required to give him a chance to hear this case, to evaluate, just like your owner just stated. And then let's look at the witnesses they're trying to excuse for mental capacity. Rebecca. Okay. She's probably the most biased witness to the cause of action. She acknowledges at a point in time where he gets confused as to who she is as compared to her sister. We're not talking about just confusion as to my grandpa always altering my cousin's name and then gets it right. Confusion as to dealing with that person and still referring to that person but not comprehending it. Our client also testifies to incidents of that. Kathy Bates, his ex-wife, testifies to an incident of that, where he's waiting on the front porch in the relevant time period. He's waiting for Sarah to get there. Where is Sarah? He's actually on the front porch. That's knowing the natural objects you're bounding. That's clearly there. The other witnesses they have testified. Leo Sweeney. Leo Sweeney was a high school friend of Oliver who admitted by himself that in 2009-2000 he really didn't see him that much. And by the way, he works for Mike Mazur, Rebecca's husband. I think that witness can be discounted entirely. Mike Mazur, Rebecca's wife, also can be discounted as being biased. It's consistent with their testimony that they say 2004. They, in lockstep, look into depositions even using some of the same He was completely, utterly fine and it's after 2004 he becomes a doctor of medicine. And they also point to David Fiennes and his affidavit. There I simply point out that they want this court to use the affidavit for the point that they want the affidavit to be used for. But they want this court to ignore other parts of David Fiennes' affidavit. For example, where Rebecca states that No, she wasn't a client of David Fiennes. But he clearly says in the affidavit, she was. So the same affidavit they point to is unequivocal evidence that everything was fine. They want you to then ignore that other part of it. So there's clearly a tribal issue, a fact as to mental capacity and the lack thereof of Oliver Bates. Undue influence. I would have also shown undue influence that this wasn't the will of Oliver Bates, but the will of someone else. They're taking over their influence, making that will theirs. Not only that, I think that if this court so chooses, it will also be given at the child court level instruction as to presumption. I believe we can not only show undue influence, but I think we can show a presumption of fiduciary relationship. Now, counsel has tried to argue that the only thing we're basing our fiduciary relationship on is the parent-child relationship. Your Honor, as I've submitted in our briefing and argued with the child court, we never say that, other than I do acknowledge the relationship. Yes, but I didn't see his daughter. That's not the point of the fiduciary relationship. The point of the fiduciary relationship that they had was the interaction between them, what he was having her do, their reliance. It's the role that they have between each other. Looking at the factors, I acknowledge there wasn't a power of attorney, but it can also be a status of what's being done. So you have Rebecca cooking for Oliver. Oliver coming over to Rebecca's home one to three times a week for insuring the meals. Her going with him to the doctor's appointments. Not only is she going to the doctor's appointments, dropping you off at the doctor's type of thing, going back in the room with her father during his exams. That's not normal. That's not a normal child helping out. That's establishing a fiduciary person. She's doing checks for him. She's doing deposits for him. She's filling his pillbox on a once-a-week basis by at least 2003. My gosh, if there could not be a person who's more fiduciary than is the person filling my pillbox that I hope I can rely upon and I'm giving trust to, it would be that person. Disparity in age, 74 in 2018. I guess it's a significant disparity in age. Health and mental condition. We've already talked about the low vitamin B12 issue of dementia, but we also clearly have, everyone agrees, Oliver, based on that period of time, had been suffering from depression also. Feeling a period of isolation. He was missing meals and whatnot. This is something we tried to show on both issues. What was the change that was taking place? The change in Oliver made from 2000 forward. We had a man that his ex-wife testified to before him. Clean, showering, clean clothes weren't crisp. They were clean overall. They weren't even cared about. Back in 2000, she described him as having slick clothing. They were so dirty that it did become slick smelling, having bugs about it. Not letting him in her house on occasion because it was so horrible. That's an extreme change. That's someone suffering from a mental condition that makes them more susceptible to undue influence. Serving a party, dominating, being dominated by a dominant party. Clearly, we have someone that is being relied upon here, that he is relying on Rebecca to do certain tasks for him. They'll want to point out to this court that other persons did checks for Oliver, too. Sure, they did. That doesn't mean that those persons couldn't have been fiduciaries for him also, or it doesn't take away the fact that Rebecca was a fiduciary for him. She was placing those economic matters in someone else's hands, just like a Muslim. That's clearly here. I mean, it points out together. We also have a situation in which you look at, They're saying, hey, Rebecca didn't do this. No. My goodness. You have a situation where, who does the will? David Feinstein. Have you ever used David Feinstein before? Absolutely not. He used Brokerman. Brokerman, a wonderful older attorney. Why do we know this? He had just used Mr. Brokerman to write a demand letter to a window company who had taken advantage of Oliver at one of the door-to-door window companies to try to get his money back. That was just prior to the execution of his will. That is who the attorney he had used was. Now, who the attorney had chosen then to do the will? Rebecca Knight's attorney. David Feinstein. Further, you look to the correspondence that took place afterwards. She sought out David Feinstein's office, to make sure the bill was going to be then sent to her so that she would then pay the bill. Again, participation in the procurement, acknowledging the will, that's other evidence that we have. We have a letter coming back, pursuant to your instructions. There's no denial of that. She did that. You also have Rebecca denying that she even knew there was a will. Your Honor, it stated right in the statement that she requested from David Feinstein's office a will of the court. You then have, if I'm not wrong, an email from her husband's account going to Sarah with the first page of the will. I'm pointing this out because it makes Rebecca's testimony less credible. But that makes me have to do something, engage in a question of fact, weighing evidence. That's what I'm doing right now, because that's what should have been done at the trial court level, and this should have been allowed to go to a jury to do that. Also, you have in procuring, you have the acknowledgement by Rebecca that maybe my dad did call from my house to make that appointment, but it wasn't her. My dad could have come over to my house to call to make that appointment when I was going on vacation from my phone. That's nonsensical, Your Honor. Her father making a phone call from her house when she was going on vacation did not meet at that time that he's going to set up the appointment with Rebecca and Mike's attorney. Was David Feinstein's deposition taken? It was not. So we only have his affidavit, so nobody tested the details of what happened? No. We had planned to do that at trial, possibly with overconfidence on my behalf and believing clearly it was a question of fact, and wanted to say some of the questioning that we'd be doing at David Feinstein's trial. Obviously, in oversight, we'd like to do that. But at the same time, I point out his affidavit. Okay. He says everything was fine. Terrific. What's the opposite of the affidavit he would give? That everything wasn't fine? That he let a person without capacity sign a will? He would actually sign an affidavit acknowledging he committed malpractice. Well, what if he said that this gentleman came in and pulled a piece of paper out of his pocket and said, I've got some notes here from my daughter, Rebecca, about what I want in the will? That wouldn't change his opinion about whether or not he had testamentary capacity, but, I mean, you don't know. We don't know any of the details. Right. I understand that. But it doesn't change the ‑‑ I don't believe it changes the duty of the court to allow us to do that, to test his knowledge, to test his credibility, to weigh those questions, to weigh the very things we know already have to be in his affidavit in one way or the other. As we pointed out, Rebecca says she wasn't a client. David Feinstein says she was. I mean, that's just one of the affidavits, which I would submit was likely prepared by counsel. So that's fine. And it says all the things we all expected to say. Everything's fine. Nothing to see here. Well, sure. I mean, so that's ‑‑ I understand your point. Well, absolutely. We have to decide the case on the record. Absolutely. On the record, of course, I still think there is plenty of evidence, of weighing evidence, of picking to be. Basically, what counsel would submit for you to do is pick their witness in the statement they made and say that their evidence should be given greater weight or should be believed as compared to the ones that shouldn't, the ones that we've pointed out. Steedman Court. First Steedman Court. Kathy Bates's ex‑wife. All have good examples of lack of capacity. We show the points for undue influence. And we show that the way there is. For example, lack of capacity. We have to show one of the four didn't exist. Not that all four didn't exist. And I think at one point Elvis becomes elusive. We have to show all four. We have to show that anyone's lacking. And I just think we've done that. I believe we did that at the court below. And we would have been going to the jury trial in a week or two following when this ruling took place. And I simply would request that this be allowed to go back down now. I believe clearly that it is a case where, sure, people can have differences of opinion. People can have, I'm going to believe David Fines over Rebecca or I'm going to believe Sarah over Rebecca on different issues. But that's the whole point. Weighing that evidence. Trying to make that decision as to who you're going to believe. One quick point, too. Also, even if we don't show it through a, we can also show fraud and misrepresentation. I believe one point in the brief is stated that there is a no point. Is there any showing that Rebecca ever said any disparaging regarding her sister? Well, I think clearly we pointed out the medical records in our brief. And I think, as your honors probably saw also, a couple of different notes were captured on the medical records. She thinks he's improving, will be even better because a month from now, the financial burden of putting his other daughter through college will be gone. She doesn't get along with him and says she never comes to visit him. And there's another point, too, to that. Now, the key thing there is Rebecca and Isaac are making that statement. Her daughter is making any disparaging statements, including those. Saying the doctor's office got it wrong. Okay. Again, I submit that's the point. She's saying basically that she should be believed on that. We should not believe it over here. That's a question of fact, not a question of law. Thank you. Thank you, guys. I believe. Thank you. If it pleases the court and counsel, my name is Elizabeth Eberspacher-Norton of Dub and Dub Attorneys at Law. And I represent the appellee who's present in court this morning. Thank you for having us. I'm going to address the issues in the same order addressed by Mr. Cade. We'll go ahead and start with the first count, which is testamentary capacity. As you all know, the elements of testamentary capacity, there are no genuine issues of material fact in this record as it relates to those four elements. Specifically, Oliver Bates knew who his children were. He knew what his property was. He was able to make a disposition of it understandably in his written will to be executed according to a plan or purpose. In fact, the uncontroverted testimony on this record by Dr. DiValli, his attending physician, is a mere days before the will execution and weeks after the will execution. Oliver Bates himself had personal conversations with Dr. DiValli highlighting who his children were, his farm ground, and the livestock that he kept. That's uncontroverted. As it relates to his disposition, there's uncontroverted affidavit of attorney fines. Not only was there a meeting one-on-one with Oliver Bates with no family members, especially the respondent not being present, or evidence that anyone attended that appointment with him, but there was a discussion with attorney fines about what Oliver Bates wanted and what he needed and what his plan was. And over a week later after attorney fines prepared those documents, he came to his office again alone, went over that document, and executed that document. That's uncontroverted. Testamentary capacity, the summary judgment ruling should stand as to that count. There's been no genuine issue of material fact brought about in this record that would prevent that summary judgment from standing. Well, there was evidence, not on the day the will was executed, but there was evidence that he'd become disheveled, that he had early onset dementia, et cetera, et cetera, et cetera. Why shouldn't a jury hear that evidence and make the decision? The law provides, Judge, that the court will determine what a reasonable period of time is around the will execution to evaluate the capacity. That is determined upon the facts of each case. In the facts of this case, we don't have to look to the cases that are cited by counsel a year before or two or three years after or two or three years before because we have uncontroverted testimony by Dr. Duvalli and the attorney and the three testing witnesses that this person knew the elements of testamentary capacity at the time he executed his will. So if we look and say someone who is in his late 70s and has age onset of dementia all of a sudden creates a genuine issue of material fact as to testamentary capacity of a will that was executed years prior, then every single elderly person who executes a will who suffers from age onset dementia is going to be subject to a will. Their will is going to be subject to a contest. It just doesn't work. I think we have to look at the facts of the case. And we are blessed in this case, unlike all of the cases cited by opposing counsel, to actually have that evidence before us. And that's an important point to make. Now, we also talk about the various witnesses that testified, you know, Dean McWhort testifying about the real estate taxes and not being paid. First of all, again, that was 2005 by counsel's admission. That was over two years after this will was executed. All the witnesses testified, again, as it relates to times unrelated to a reasonable time period within the will and execution. Christine McWhort herself testified she only saw Oliver Bates a handful of times each year. The petitioner herself testified that from 2001 through December of 2003, and remember the will was executed in February of 2003, she did not speak or see her father from 2001 through the end of 2003. So the record is important to look at here. Again, we don't need to look at the disheveledness and the dementia. And I would point you to the Forbert case. I mean, that case is excellent on point where the Supreme Court specifically said disheveledness, dirtiness, sloppiness, that does not create a genuine issue of material effect as it relates to testamentary capacity. It says it does not do that by itself. Correct. That's what the case says. And that's all they really have when you look at it. That's all they really have. And, again, there's also case law out there where dementia in and of itself does not create an issue of material effect as it relates to testamentary capacity. And we have the physician himself testify that he knew who his kids were, he knew what his property was, he knew how to make a plan. He also testified that the B-12 levels of Oliver Bates were fine at the time of the will execution. So I just want us to be very careful. I believe that, you know, counsel did take certain liberties in this brief that are not exactly the way that the record reads. Again, you know, we need to look at these opinions and what the law says about them. You know, Illinois law says when you look at lay opinions as it relates to middle capacity that there have to be based on facts. So, you know, we have a lot of opinions out there, like, you know, many of these will contest cases, but how many of them are based upon fact rather than just a generic opinion? Again, what precedent does the court set to say all you've got to find is a witness that says I think Oliver Bates was crazy, and then all of a sudden you've got a tribal issue of fact on testamentary capacity in a will contest? That's not what the law provides. And, you know, even if you do have facts, the opinion has to be based on facts, this is a quote, having nothing to do or, excuse me, it has to have something to do with the qualities required to make a valid will. So, you know, when you look at the kind of things that are testifying to, you know, it was mentioned about these occasions as it relates to knowing the object of your bounty. Mr. Cate mentioned the fact that, or you may have read the brief about there was this interaction at the grocery store where Oliver Bates mistook one daughter for another. But if you read a little bit further in the deposition, you'll see that immediately after that daughter turned around, because they both have long, dark hair, Oliver Bates said, oh, I'm sorry, I've got the wrong person. So you have to go further into the record. You can't just, you can't, it's not fair to pick and piece part of the deposition, transcript of the evidence and the record before the court to say, oh, we have a genuine issue of material fact here, we need our data in court. That's not the way this works. I think we're requesting respect that the court does not do that. And also, let's look at what's barred by the Dead Man's Act. Any conversation that Becky Mazur or Sara Tzatzakis had with the deceased and his mother, so anything in the record and anything they relied upon in their brief as it relates to those conversations, the grocery store, the conversation about who on the family tree consists of, those are all inadmissible under the Dead Man's Act. But even if you admitted them, again, they don't go, those facts do not go to the elements creating test of material capacity. One more thing about Christie McCormick. Let me ask a question. Was the Dead Man's Act an issue raised in the trial court? Yes. And did the trial court make a ruling on that? No ruling. There was an agreed order agreed by counsel. I believe Mr. Cate would tell you that the counsel agreed that any conversations between Oliver Bates and his client or our client and their spouses was going to be inadmissible at trial. Okay. So it should be clear from the record then that the trial court did not consider or rely on anything that would have been covered by the Dead Man's Act in ruling on the summary judgment motion. I do not believe the court mentioned that. And, again, we did not, as Mr. Cate stated, we did not notice that motions were hearing. Counsel and ourselves agreed on what the law says. That being that those conversations would be inadmissible under the Illinois Dead Man's Act. Okay. So we really don't know what the trial court did about that? The trial court did not mention the Dead Man's Act. Okay. He also didn't mention what he relied on or didn't rely on other than he relied on the record before him. Okay. All right. Thank you. And also on Christie McBorn, I want to point one thing out because she was mentioned a few times by counsel. If you look at her deposition testimony, you know, this is the witness. She testifies that she goes to Oliver Bates' home. No foundation, by the way. We don't know when this was. One of the few times she sees him here. She goes to pick up a family bed that was not being used by Oliver Bates and located in storage. Oliver Bates said it was fine if she took the bed. And she thought that was strange. And that was one of the reasons why she gave her opinion at her deposition that she believed that he did not have capacity. So, again, the record, that doesn't create a genuine issue of material fact as a testamentary capacity. That's nonsensical that she goes to pick up the bed. He agrees she can take the bed. And all of a sudden, well, that was unusual for my uncle to let me do what I wanted him to do. If you go on to David Fines' affidavit again, this is really important for us to understand that David Fines in his affidavit stated that he was an attorney for Becky Missouri, her husband. And that's true. But it was after the will execution. So, again, it's our burden to depose David Fines. But if you look at the affidavit of David Fines, it doesn't say that she was his attorney prior. It does not say that. And the fact of the matter is if you look at the deposition transcript, you'll see that Becky testified at length about the fact that all the rates, that he was a neighbor to David Fines' family. He watched David Fines grow up, and he was a family friend. So it wasn't unusual that David Fines was chosen to meet with and to do the will execution. Why wasn't it Bob Roverman? We don't know because all verbatim isn't here to tell us. So we don't know why he chose David Fines. But he knew that it was his choice. He was the only one that met with him. He was the only one that discussed his will execution with him. And he was the only one that he actually executed the will with other than the three attesting witnesses. As it relates to the undue influence count, there is nothing more here than a parent-child relationship. You know, we all know the relationship we have with our own parents. But the fact of the matter is attending a doctor appointment with your 77-year-old father, helping him pay his bills that he asked you to, which is the uncontroverted testimony, and having him over to dinner once or three times a week, maybe five or six or seven if they're widowed, is not unusual. That's not unusual at all. That is a common parent-child relationship, especially in central Illinois. In fact, if that's not your parent-child relationship with your father, then you're a bad child. So that does not create a genuine issue of material fact as to undue influence by this child. And, again, what a precedent we set, especially in central Illinois, that if you're a child and you're at home because you just happen to be local and your siblings are somewhere else, and you spend that time away from your work taking your parent, your widowed parent, to the doctor or feeding them, et cetera, and all of a sudden you happen to get more of a charm and then you get sued by your siblings on a will contest because clearly you've undue influence because of this fiduciary relationship, what an awful precedent to set. It doesn't make sense, and I think it is a dangerous line for us to cross. As it relates to the checks, I think it is important, the fact that he directed this. He directed these people to help him. If you look at the cases relied upon by counsel, like the Rossler case, for instance, or the Hoover case, in those cases you have a decedent who is literally giving their finances to the respondents, beneficiaries, is giving the respondent beneficiaries the power of attorney, is living with them, is completely 100% reliant upon the respondent beneficiaries, who in a majority of the cases cited by counsel are unrelated. We have none of those facts here. Oliver Bates was taking himself to his attorney. He was taking himself to some of his doctor's appointments. He was feeding himself when his daughter wasn't kind enough to have him over to feed them. That's the person that we're talking about here prior to the will execution and around the time of the will execution. That is not the person that counsel would have you believe signed this will. Did he become that person? Of course he did. He went to a nursing home in 2006, and the girls had co-guardianship over him. You know, that's an important fact. The person, the sibling that's allegedly unduly influencing, who has the power of attorney, who could easily, from my experience, obtain sole guardianship over her father because her sister lives three and a half hours away. What does she do? She has a co-guardianship. She gives full access of the bank records to her and discusses all issues with her regarding where her father is going to be placed and what treatment and medical providers are going to deal with him. That's not someone who unduly influences. There is no true history of material fact here as it relates to the elements of undue influence. I don't think you can get over the hurdle of the fiduciary relationship creating a dependent and a dominant party. I don't see it. I don't think it's anywhere in the record. Let's say that your honors do get over that hurdle. Let's go to procurement and preparation. The only thing you have in this record is a phone call from Becky Mazur to David Fines making sure that that bill got paid by her father. That's all you have. If you look at the cases relied upon on counsel, those are cases where the respondents, beneficiaries, take them to the appointment, write letters to the attorney telling him or her how to write the will, attending the will execution with the decedent in the same room. That's procurement. Okay, that's preparation. That is not what we have here. We have Becky Mazur, which your record will show, had a conversation with her father about the fact that he was having a medical procedure and that he needed to have a living will and that she encouraged him to do that so that his wishes were known, and that is all in her deposition transcript and all of it is uncontroverted. And he took her advice and he went on his own to David Fines and he got that taken care of, which she didn't know. So the durable power of attorney that is mentioned in Fines' affidavit is a durable power of attorney for health care. Correct. And that is executed the same day as the will. After the will. All right, and named your client as the person in case something happened at the surgery or whatever. That's exactly right. Surgery is going to take place there right in time at the Taylorville, and they want to make sure that his wishes were known. She had no idea her father was executing a lost will and testament. There's the confusion with calling it a living will, which people stray away from now, but that is what they called it and that's what she understood he was going to do. And that's it, and that's all in the deposition transcript, and none of it is controverted. There's no judicial material fact there. So is it unusual for the child who knows this Mr. Fines because he's a family friend and her dad tells her, I'm going to go get this taken care of, is it unusual for her to say, let me take care of it, make sure this bill gets paid? Absolutely, that's not unusual, especially because she testified that I didn't even know that there was a will. Counsel argues, she knew there was a will because we have an email, and she sent an email with a copy of the first page of the will. That email, folks, was around or after the time that the co-guardianship was instituted. And the testimony in the deposition transcript was that after that happened, Becky went through all of her dad's things because she wanted to make sure she knew where the important papers were. Is that unusual? Absolutely not. Does it create a genuine issue to material fact as it relates to procurement or preparation of the will? No. That is a stretch that you can't even make. Rossler just doesn't apply here. The facts are so distinguishedly different from the facts in the instant case. I don't see how on earth we can possibly look at Rossler in order to create an overturning of the summary judgment entered by the trial court. In the Rossler case, again, we have a situation where the defendant beneficiaries, also the power of attorney, actually asks their attorney to draft the will, tells the attorney how to draft the will. And this is a case where the decedent was completely 110 percent reliant upon those defendant beneficiaries. He was staying with them. They were paying everything for him. He was giving them all of his money. So, again, none of those facts are present here. There is not undue influence in this case, but more importantly, it's not even a genuine issue of material fact that Becky Mazur unduly influenced her father to create the will that he created. If you look at fraud and coercion, which is what counsel is arguing when they talk about these negative comments, what you have to have, you have to have two things that we don't have here. Number one, comments about her character. Any alleged comment made, as outlined in my brief and as shown on the record, any comment allegedly made by Becky Mazur about Sarah had nothing to do with her character. These comments that counsel highlighted for you that Becky allegedly made to the doctor, she testified. I don't remember making those comments. Let's say that she did, in fact, make those comments. What were the comments? That Sarah does not visit her father. And is that true? Absolutely, that's true. That he's paying for her college? Absolutely true. He paid all of her college expenses and her medical insurance, and all of that is in the record. And did she visit him? No. Sarah Dizaskis admitted on her deposition, I didn't have one conversation or one visit with my father from 2001 through December of 2003. So are those attacks at Sarah's character? No, those are mere statements of fact, if in fact they were said. Does that create the level of coercion or fraud? Absolutely not. That is a huge hurdle and a huge burden. But more importantly, folks, is when we look to that element, if you are able to meet it, there has to be disinheritance. All of the cases say, if you're looking at disparaging remarks about the petitioner, that results in a disinheritance. There's no disinheritance. He knows who his kids are because they're both named Dutton as well, and he specifically gave part of his estate to one child and the other part to the other child. An uneven distribution of one estate absolutely does not create a genuine issue of material fact as it relates to undue influence. Your opponent says in his brief that distribution was 99 percent to 1 percent. Does the record support that? No. Absolutely not. That's an opinion of Mr. Kate, which I absolutely disagree with, just because we don't have the figures before us as it relates to evaluation of the assets. Okay. In order to invalidate a will on undue influence, again, you have to show that the testator was overpowered and induced at the time he signed his will. There's just absolutely nothing in the record to support that or to create a genuine issue of material fact as it relates to that finding. Reposing trust and confidence. Again, I mentioned this before, but, you know, the record is clear that Oliver Bates controlled his finances up until 2005. He directed people to help him pay his bills, and he directed Dean McWhorter, that witness who gave his lay opinion. Dean admitted on the record, he told me when he wanted his cash rent because he was his tenant farmer. He told me when he wanted it, and then I gave it to him. So this is someone who clearly has capacity. Again, the case law talks a lot about whether or not the testator is able to handle their business affairs, and all the witnesses agreed. He told us, come help me pay these bills. This needs to be taken care of, and like I said, Dean McWhorter himself said, he told me when he wanted his cash rent, and I paid it to him. And again, I'm looking at the estate of Rothenberg, which is used in our brief. The mutual respect, confidence, and trust between a parent and a child and care for an aging parent by a child are to be fostered and admired, not looked upon with suspicion, nor do they give rise to a presumption of a fiduciary relationship. None of the things that Becky helped her down with had created this fiduciary relationship with that element necessary to have an undue influence finding. The final case they relied upon is Dossett. Dossett does not apply in that case again, and it wasn't even mentioned by counsel, probably because the facts are just so distinguishable. But the beneficiary of a contested will, again, had the power of attorney, took care of all the decedent's business, and so the court found there was that fiduciary relationship. Again, she wasn't the power of attorney, and she wasn't taking care of all of her father's business. It's just not there. Unless your honors have any other questions, that's all I have today. Thank you so much. Thank you, counsel. Rebuttal. Thank you, Your Honor. Several points I wish to make. One is which they point to Sarah not coming back to see her father toward the end and saying, well, that's kind of a complete delusion, and she didn't want to come back to see her father. You can see in her depositions, she was saying that she was taking double classes at the U of I, and trying to get that all crammed in and done. She wasn't going back and seeing anybody. So I think that's kind of trying to misstate or give a different impression to this court. Is the evidence, though, that there was not even a phone call? I don't know if that's true. I don't know if that's true. But, again, I'm questioning the fact. I'm just asking because I understood counsel to say there was no contact. I don't believe that's accurate, and I believe it's accurate, is what she testified to, but she's not seeing anyone at the time, and that is what is going on at that point. Also, looking back on it, and real quick, I'm just trying to cover this. Procurement. One of the other things that they gloss over is saying, you know, he went there and stuff. They discount Kathy Bates' statement. Kathy Bates' statement was that Rebecca said that to Kathy. She took it to the world. She took it to David Heine's law office. They kind of gloss over that, and no one would say, well, let's discount Kathy Bates' testimony as to that. Well, that's, again, a weighing of the evidence, Your Honors. We should discount Kathy Bates' testimony and believe Rebecca's testimony about who took him to the appointment to see David Heine. Ressler, we argue also, is right on point. Look at Ressler. A person who formally kept himself clean and mentally aware as he began to live in a filthy or squalid condition. One thing I meant to mention earlier, later on it's acknowledged that at the time, during this time period, Conor Bates was having mice or other vermin run through his house. He didn't care. He would refer to them as his wildlife. I mean, Your Honors, that's extreme. And, again, and this goes to Your Honor's point earlier, which was that in and of itself wouldn't be enough, right, living in a squalid condition or having a show of appearance. No. Each individual thing taken by itself, if that's the only one we had, wouldn't be enough. Just having onset of dementia or just having Alzheimer's or just having this. But that's the point. When you add them all up and you have all these different elements and you bring them all together, then you do have a tribal issue to try to make that determination, Your Honors. And this is more than just a daughter helping her father. This is a daughter taking over for her father. That's a difference we have here. Also, look at the history of the parties. One would say this is consistent. No, what's consistent is all of Bates. Everybody acknowledges both children love their father. Their father, by right of revelation, loved both of his daughters very much. And what did he do for them? He bought them both cars. He paid for both their college. He helped support them both. That's consistent with all of Bates throughout his lifetime. But then in the end, at the end, his greatest asset, he determines, no, that's all true right now. Different than I have throughout my life. And I apologize, but 99.71% is mine. I would ask to support the judicial notice of the value of farmland. You want us to take judicial notice of the value of farmland? It's doing very well. Is there a book somewhere we can look at it? No, I think everyone knows farmland is doing quite well. And that's my simple point. It might be 90% to 10%. I would argue that ultimately. But that would be something we have testimony on and obviously going into further. I simply put it out as it's extremely disparate. And I think counsel would acknowledge that it is an extremely disparate difference. And your honors, I understand. It would be my burden to try to show these things and to show it all. But the fact remains, we have a tribal issue. We do. And what counsel, much of what she was doing was a very good job at having this court begin weighing those things. And asking the court to do so. That's what you want the court to do. And that's what counsel is asking you, your honors, to do at this time. Believe this testimony over other testimony. Simply put it out that the time period around matters. We have evidence that during this whole time period after 2000, there are issues. And they want to point to different things that Sarah's deposition. Sarah couldn't say specifically on that day she knew something. It's not unusual for the child at school to not have a specific sentence she could point to of it. And I respectfully request this to be sent back down to the trial court to allow the jury to make this decision. Sarah requested a trial by jury, not a trial by judge. And surely not a trial by a judge who simply weighed evidence and didn't allow us to put on a case. I appreciate your time this morning and thank you. Thank you, counsel. We will take recess until 10 o'clock.